EDWARDS, Judge.
Phillip Ducote appeals a final decision by the Louisiana State Civil Service Commission upholding his termination as a floor maintenance supervisor at Charity Hospital in New Orleans. We reverse.
On November 30,1976, Ducote was sent a notice of suspension, effective December 2, 1976. On January 10, 1977, appellant was notified of his termination, effective January 17, 1977. The termination grounds alleged were improper performance of duties and falsification of records/payroll fraud.
Ducote, an employee at Charity for over fourteen years, appealed to the State Civil Service Commission. For two and a half years, Charity Hospital fought bitterly to dispose of the appeal on procedural grounds. After Charity’s attempts to prove the appeal untimely had failed, the merits were considered. On November 16, 1979, the Civil Service Commission denied Du-cote’s appeal. This appeal followed.
Charity concedes in brief that there is no longer any procedural opposition to the appeal and that the sole issue before this court is whether the record supports appellant’s dismissal.
Appellant specifies that the Civil Service Commission erred in
finding appellant's discharge reasonable based on the evidence presented; and 1.
2. failing to remand the case for further evidence relating to the motivations of Donald Frazier, Hospital Assistant Administrator for General Services. (Ducote claimed discriminatory bias and animosity on the part of Frazier.)
Ducote’s termination was based on specific charges that 1) employees were permitted to sign their payroll records before concluding the period in which they were working, and 2) Sedonia English, a subordinate of Ducote’s, was listed by Ducote as working and was paid for three days work when, in fact, she was absent.
The practice of signing payrolls prior to the conclusion of work periods was fully explained by Merlin Brisset, Ducote’s immediate supervisor and Charity’s Housekeeping Director.
By Mr. McPherson (Attorney for Ducote): “Do you recall the policy at Charity Hospital and the Department in which Mr. Ducote was concerning pre-signing of time sheets?
A Yes, sir.
Q What was that policy.?
A It was the general policy throughout the Department that they sign ahead of time. For the simple reason-ah, the reason for this that the payroll-the size of our payroll is so large and we have to get it in ahead of time. And in order to get it in ahead of time the people had to sign the payroll ahead of time. In fact, they’re doing it right now. In fact, this particular point that you brought out, Mr. Frazier sent me a memorandum stating for me to cease from doing this. But now we’re back to doing the same thing. We have to submit our payroll ahead of time so — in order for payroll to get the checks out. So it’s being pre-signed now and time is estimated. In other words, our checks for this coming Friday, for the payroll to go in, has to be submitted-has to be submitted today or the week *422 before that the payroll’s due in order for the Accounting Department of the payroll Department to have enough time to be able to do that.
Q So that when an employee signs the time sheet it covers the period in advance of the date on which the employee actually signs?
A Right.
Q That’s the present policy?
A That’s the present policy right now. We have to.
Q And was that the policy in existence in August and September of 1976? Did Mr. Ducote cause that policy to be instituted?
A I found it there when I was there, when I started working there.
Q When you started working there?
A Yes, sir. That was the procedure then.”
The payroll practice in question, while certainly not ideal from an auditing point of view, was practical, widespread and of long-standing use in the Housekeeping Department where some 400 workers were employed. Mr. Brisset testified that the payroll department requested such a procedure. We find no ground on which to seriously criticize appellant, let alone fire him.
The Civil Service Commission found that Ducote had reported Sedonia English present for work on August 3, 4 and 31 of 1976 when, in fact, she was absent. This finding was based primarily on the testimony of Lillie Worthy, a fellow custodial worker of English, and Georgia Baker, a sister and also a fellow custodial worker of English.
Charity attempted to buttress the testimony of Worthy and Baker with that of Cynthia Bruce. However, the record shows that Bruce did not go to work on August 3 or 4 and therefore her testimony regarding the attendance of English is hearsay and of little value. Furthermore, when Bruce went to work on August 5, 1976, Ducote gave her a “telegram” of reprimand for missing work. Bruce then hit Ducote with a flowerpot and was subsequently discharged.
As further evidence against Ducote, Charity introduced both the transcript of an October 14, 1976, interview between State Police Trooper Ed Holtzendorff and Sedo-nia English and a statement signed by English on October 29, 1976.
During the interview, English stated that she was not at work on the days in question. The October 29 statement was to the same effect.
We cannot grant much credence to testimony elicited as a result of this interview. The interview was conducted in an, at best, forbidding atmosphere. The only persons present were English and police personnel, Trooper Holtzendorff and Sergeant Anthony Genusa. In addition, a short passage from the interview easily demonstrates its coercive and therefore worthless nature.
Holtzendorff: “What about the 31st of August where you indicated working eight hours?”
Sedonia: “Thirty-first of August, let me see now.”
Holtzendorff: “That would have been a Tuesday.”
Sedonia: “I ought to be straight about them dates, I don’t even know about the first date. But I do not (sic) that I be sick every month and I take off some days. I do be sick.
Holtzendorff: “You were off sick on the third of September, which was three days later and you were marked as taking sick time indicated by a B in that column on the attendance sheet. Now on the 31st you are carried as eight hours and I have some statements from several people on the Housekeeping crew that work with you, that can swear or testify in a court of law that you were not in fact at work on that day as well as on the third of” (emphasis added)
Sedonia: “Well, I wasn’t at work on those dates, that’s a fact, I know that.”
At the Civil Service Commission hearing, with counsel present, English explained that she had been confused during the police interview and that the days of work she *423 had missed were in September and not August. Her explanation is verified both by Charity’s payroll records and the absence records kept by Ducote himself.
Merlin Brisset testified that Ducote’s subordinates worked in at least five buildings, to walk the floors of which would take several hours. He further testified that he clearly remembered seeing English on August 3 and 4.
Phillip Ducote, testifying in his own behalf, stated that English was working on the days in question. His records are in accord.
The only valid evidence favoring Charity’s version is the testimony of Worthy and Baker. Their testimony must be considered in light of the huge area in which they worked. It is highly possible that an employee could work for several days without seeing a particular fellow worker. Consideration also must be given to the hostility engendered by the placement of Sedonia English in authority whenever Ducote was not present.
The record clearly demonstrates Phillip Ducote’s excellent work record. His superi- or, Brisset, called him “one of the best employees” and stated that his punctuality and attendance were “Excellent.” Brisset emphasized that “Mr. Ducote was tough on all of his employees.” This was illustrated by his issuing a disciplinary warning to Sedonia English on April 29, 1976. The warning stated:
“You are here to work 8 hrs. and if we are directed by Mr. Brisset to clean in patient areas that is what has to be done. Patients has (sic) tops (sic) priority. This is a verbal warning that if you refuse to accept an assignment again much stronger action will be recommended.”
Far from demonstrating the favoritism toward Sedonia English alluded to by Worthy, Baker and Bruce, this warning shows a demanding superior.
During the Civil Service Commission hearings, certain testimony admitted without objection, tended to show that Donald Frazier, Charity’s Assistant Administrator for General Services, was intent on firing Ducote.
Direct examination of Merlin Brisset resulted in the following:
Mr. McPherson: “Have you had any discussions with Mr. Frazier concerning this matter?
A Ah, after this thing was well underway Mr. Frazier discussed it with me and made a few statements, naturally, that it was unbecoming of a man of his appointment, as an Assistant Administrator, telling me that he would-in order to obtain the means one had to do what has to be done-and, ‘I’ll lie, I’ll cheat, I’ll do anything to accomplish my end.’
Q And what end was that, Mr. Frazier was referring to?
A Get rid of Mr. Ducote and he was trying to include me in that and he’s still trying to do that.”
Earlier, Sedonia English had testified as follows:
Mr. McPherson: “All right. And did you talk to Mr. Frazier?
A I talked to him several times.
Q Did Mr. Thibodeaux tell you that he didn’t think there was anything-what did he tell you?
A The only interview I had with Mr. Thibodeaux he told me he didn’t see no sense in pursuing this because it was just a bunch of ladies was jealous-they didn’t want to take orders from me. And he said that if it was up to him he would just let the matter drop, but Mr. Frazier had give him orders to pursue it. Other than that he say he would have no interest in it because he didn’t see nothing to continue because it was nothing but a bunch of ladies jealous and (sic) was making complaints against me because they didn’t want to take orders.”
Such testimony indicates that the calling of Mr. Frazier would certainly have been in order. In view of our decision today, such calling is unneeded.
We find that there is very little evidence to support a finding of payroll fraud and *424 there is a great deal of evidence, both testimonial and documentary, opposed to such a finding. By no stretch of the imagination has Charity Hospital proven its charges by a preponderance of the evidence. For the Civil Service Commission to have found as it did was manifest error.
For the foregoing reasons, the Civil Service Commission decision appealed from is annulled and reversed. It is hereby ordered that Phillip Ducote be reinstated in his former position with all back pay, seniority and privileges. All costs of these proceedings, both before the Civil Service Commission and this court, are to be paid by Charity Hospital of Louisiana at New Orleans, DHHR.
REVERSED AND RENDERED.